**Judge Jones**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>      v.<br><br>HIEP NGUYEN,<br><br>              Defendant. | NO. CR09-402RAJ<br><br>HIEP NGUYEN'S<br>MEMO ON SENTENCING;<br>MOTION FOR DEPARTURE |

## I. RECOMMENDATION

30 DAYS IMPRISONMENT;
6 MONTHS ELECTRONIC HOME DETENTION;
200 HOURS COMMUNITY SERVICE;
RESTITUTION; and
5 YEARS SUPERVISED RELEASE.

## II. BASIS FOR RECOMMENDATION

On August 16, 2010, Hiep Nguyen, the defendant, pled guilty to Count 1 of the Indictment, conspiracy to commit wire fraud. Hiep Nguyen first appeared in court on December 3, 2009, pursuant to a summons. The government did not object to Mr. Nguyen being on bond. Thus, by the time of sentencing, Mr. Nguyen will have been in the community for a year without any problem or report.

SENTENCING MEMO 1

**ROBERT W. GOLDSMITH**
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-2800

## U.S. Guideline Calculation

We agree with the Probation department that his base offense level is 7 plus 14 for the loss amount between $400,000 and $1,000,000, minus 3 for acceptance of responsibility resulting in an offense level of 18 with a History level of I.  This gives him a range of 27 – 33 months.  The government and the defense agreed not to seek any role adjustment in this case.  In addition, as this Court is aware, Hiep Nguyen testified at a codefendant's trial and will earn a 5K1.1 motion, which frees this Court to depart from the Guidelines, as it sees fit and in conjunction with the factors of 18 U.S.C. § 3553(a), as described in the following sections.

## The Weight To Be Given the Advisory Guideline Calculation

To be sure, the Guidelines in this case provide a harsh sentence of 27 – 33 months.  This is harsh because Mr. Nguyen is a first offender who has never been in trouble before or since this case.  It is harsh because from the very first time he was confronted by the FBI on January 23, 2008, he fully admitted his wrongdoing—providing eleven pages for an FBI 302 report and signing a handwritten statement.  Thereafter, he talked to the FBI on June 30, 2008, and November 17, 2009.  At no time had he interposed a lawyer between himself and the investigators—until after he was charged.  Once he was given the opportunity to cooperate, he aided the government's effort.  This culminated in his testimony at Mark Ashmore's trial.  Given this consistent history of cooperation and truth-telling, despite drastic legal consequences, this Court should take this into consideration in determining what to do here.

## The Nature and Circumstances of the Offense

There is no question this is a serious offense.  The government correctly points out that fraudulent schemes such as this one had a tremendously negative effect on the banking industry and the economy as a whole.  But it is important to recognize that this was symptomatic of an era.  It does excuse the conduct but it puts it in context.  To begin with, a very large number of people benefitted from the real estate bubble.  For example, people who flipped properties and all of the banks, lenders, mortgage companies and investors made large amounts of money.  Since real estate would rise forever, so the thinking went, a few little lies wouldn't hurt anyone.  Until the bubble burst.

SENTENCING MEMO 2

The government in its sentencing memo (at p. 7) argues that the scheme caused Pierce Commercial Bank in Tacoma to go out of business and that this is a reason for the Court to give Mr. Nguyen a stiffer sentence.  The fact of the matter is that lenders such as Pierce Commercial were more than eager to make these loans and pass them on to other investors.  Since they, like everyone else during this real estate roller coaster ride, never scrutinized the loan applications and documentation, because they were going to sell it to someone else.  So their own negligence fueled by their own greed caused them to go bankrupt.  The letter of Mark Ashmore, cited below, lends support to this.

After all, it has been well reported that some investment companies and banks that either went bankrupt or needed government loans or subsidies continued to reward their top level executives with unconscionable amounts of money.  (Washington Mutual comes to mind.)  These rewards were reaped, despite their firms' losing money and selling securities that contained these very mortgage loans!  And most of them will not be prosecuted.  Moreover, even in this case, there were 30 or more people who were paid money to be straw buyers, to do escrow work, write or sell loans, and perform other chores that benefitted from this scheme and will not be prosecuted. (Some of them may not be prosecuted because they did not openly and honestly admit their wrongdoing as Hiep Nguyen did.)  There is no question that the government 'cherry-picked' the four defendants from a much larger group of people who, at a minimum, told lies or looked the other way, while pocketing money.  In some respects, the four defendants are examples to be made to the greater society.  But does that justify a harsh prison sentence to this first offender?

### D. History and Characteristics of Hiep Nguyen

Under pre-*Booker* analysis, we would be arguing this crime is an aberration in Hiep Nguyen's life.  For at 43 years of age, Hiep Nguyen finds himself in a place he never expected to be.  His family emigrated from Vietnam, worked hard and honestly, and expected the same from their son.  Except for the anomaly of this case, Hiep Nguyen did work hard and honestly.  During high school, into college and beyond, Hiep worked at the family restaurant.  He graduated college from Seattle University in 1992 and worked in his own businesses and for others.  After it became clear that the real estate venture was

SENTENCING MEMO 3

failing, he began working for REI on a part time basis—a job he still maintains in addition to his full time work with Avidian.

So how did this educated, well-brought up man get involved in this conspiracy? He had known Mark Ashmore since middle school. When Ashmore offered him an opportunity in real estate—an area Hiep Nguyen knew nothing about—he jumped at it. At first he would just loan Ashmore money and get repaid. (See Exhibit 1—copy of an early promissory note, marked "paid.") Then Hiep Nguyen loaned more and more money until he borrowed $300,000 from his parents. (See Exh. 1, promissory note from 6-15-2002.) Hiep was so convinced of the validity and safety of Ashmore's investment plan that Hiep Nguyen brought his own brother Si Nguyen in as well as his parents. (Exh 1, promissory note from Mark Ashmore to Si Nguyen for $350,000, dated 11-8-2002.) Hiep became the actual buyer for two houses and also tried to manage and improve some properties. This includes the property at 10536 NE 24th Street, Bellevue, WA and the one at Cabin Creek, where he resided and tried to make something of it for some years, until he ran out of money.

Ironically, this is the unusual case where Hiep is **both a victim and a perpetrator.** People who knew Mark Ashmore, as Hiep did, also invested with Ashmore. During the investigation of this case, I had occasion to talk to a witnesses who lost money with Ashmore, such as Cole Sherwood and John Shipps (see their letters below) and a third man, Zach Lee. Mr. Lee told me about his investments with Ashmore and how Hiep was always straight and square with him about the business; whereas, at a certain point, Ashmore stopped taking his calls after he began defaulting on his payments to Lee.

Gradually, Hiep Nguyen got more involved and at a certain point, grew uneasy and desperate due in part to the outstanding notes he, his brother, and parents were owed by Ashmore and his entities. It was at this point that he involved two other straw buyers, and at about this point, he also realized things were less than honest. When he reached the point of no longer believing Ashmore, he began warning other people about this scheme to head off further losses and victimization.

This history is well documented in the attached letters (in Exhibit 2) from the following people: Parents, Anh Nguyen and Huong Dinh.

SENTENCING MEMO 4

James Wong, Co-founder and CEO Avidian Technologies.

Barbara Huang, CFO Avidian Technologies.

Thuy Nguyen, girlfriend.

Bill Bishop, retired banker and neighbor from Cabin Creek.

Kathy Bishop, neighbor and (retired) teacher for 30 years at Echo Glen Children's Center.

Bob Yokobe, known Hiep for 4 years in Christian group.

Richard Miyauchi, known Hiep 6 years in Christian group.

Trenton Yenokida, friend of 8 years.

Cole Sherwood, friend since 1987 and investor with Mark Ashmore.

Lisa Tarrach, friend for 14 years.

John Shipps, friend of ten years and victim of Ashmore's scheme.

  Hiep's parents mention the good faith effort their son has made to pay them back: "In good faith, Hiep has contributed each month towards our retirement income. He has also been paying back his older brother Si for his investment lost."

  Hiep's girlfriend, Thuy Nguyen, corroborates his sense of duty and responsibility: "I have seen for myself how much embarrassment, sadness, shame and guilt Hiep has been carrying with him. It weighs heavily on his conscience that he has disappointed others, especially his own parents and family."

  As mentioned, Hiep Nguyen has been working hard for nearly the last three years for Avidian. James Wong, co-founder and CEO of Avidian, who originally hired Hiep, does not want to lose a valued employee who has worked hard and risen up through the ranks: "For the livelihood of Avidian and the 32 families that depend on Avidian to success, I request the court and Judge Jones to give Hiep Nguyen as much leniency as possible. Hiep is deserving of a minimum sentence. Hiep and I even talked about a situation where he can work at Avidian during the day and do house arrest at home after work. Loosing Hiep would have a large negative impact to Avidian's livelihood."

  Barbara Huang, CFO of Avidian, echoes these remarks and requests: "From our company's

SENTENCING MEMO 5

perspective, I hope that the sentence you will impose on Hiep will cause minimal disruption to his team, because I know that his absence will lead to some loss of revenue to us and to his family."

Kathy Bishop, who lived next door to Cabin Creek, one of the properties that Hiep tried to maintain during the scheme, says this about him: "It is hard for me to believe that Hiep finds himself in this kind of trouble. He has been honest and trustworthy, and a man who I really respect. If we were looking for a manager for our lodge, I wouldn't hesitate asking Hiep to do this job. He is kind, considerate and really cares about other people. I have also met his family and been impressed with their hardworking determination to make a living in this country." Her husband Bill Bishop also has high regard for Hiep: "I have been a bank executive and business owner for over 40 years and have met few people who can match Hiep Nguyen as a colleague. As a Marine Corps Officer, I have always judged a person's character by thinking about the kind of person I would want at my back when the going gets tough. Hiep is one of only about 10 people who I know well that I would put in that category."

Richard Miyauchi, a Christian group co-leader, writes this of Hiep's acceptance of responsibility: "Based on my numerous encounters with Hiep, I believe that Hiep has recognized his past mistakes, and that he is fully committed to living a transformed life. He has demonstrated that he accepts full responsibility for his past actions, and is sincerely remorseful about it."

Cole Sherwood, a friend for 23 years, writes this about Hiep's 'charitable works': "Hiep has been an amazing friend for me. I was paralyzed in a car accident in 1991. The emotional and physical battles I have experienced have been challenging. Hiep's help and assistance has been unending and has made life easier." Mr. Sherwood also trusted Ashmore with his money as well: He notes: "I have also known Mark Ashmore and have been swindled by his broken promises. He still owes me a considerable amount of money, and currently I have a lien judgment against him which I don't believe will ever be repaid."

Hiep's friend John Shipps attests to what an aberration this crime is: "I've never seen or heard of Hiep either doing or planning on doing anything to take advantage of or harm anyone." Significantly,

SENTENCING MEMO 6

Mr. Shipps was also a victim of Ashmore's scheme in a way similar to Hiep Nguyen: he trusted Ashmore and thought it was a good investment. As Shipps writes: "Myself, I have also been impacted financially by believing and trusting in Mark Ashmore. His broken promises have left a lot of scars for many people. I'm still trying to get myself out of the hole Mark left me with." Regarding Hiep's involvement, he writes this: "It's troubling that a man of Hiep's integrity, by getting wrapped up with a swindler, will possibly face punishment for his association with the wrong man. If what Hiep did was wrong, I'm certain that it was unintentional and probably due to his being manipulated by his association with the wrong people."

Trenton Yenokida writes: "Not excusing any wrong doing on his part, I believe that Hiep is a man of integrity and good character, honesty and forthrightness, striving to make amends as well as move forward in positive ways from past affiliations that negatively influenced him." Another member of his church, Robert Yokobe, a contract officer with the U.S. government for 25 years, makes this observation about Hiep: "When Hiep shared with us his situation regarding this case, needless to say we were shocked. Hiep has always displayed the qualities of love, kindness, and compassion toward his fellow man. My judgment of these qualities in him is that they have always been genuine. Overall, Hiep is a man of good character. His involvement in this case was based upon poor choices being made and believing two wrongs can make a right."

Lisa Tarrach concurs about Hiep's character: "He has been there for me during difficult times as well as good times in my life and I don't know what I would do without his friendship. He has always demonstrated a desire to help others in any way he can, and volunteers for different organizations to help those in need."

Amazingly, the lead defendant in this case, Mark Ashmore, does **not** think this Court should incarcerate Hiep Nguyen: "I believe Hiep as co manager of our business did not intentionally harm anyone, but rather was caught up in our short falls, bad investments (such as the one in Central City, CO) and just plain poor planning." Ashmore echoes what we have argued about the context in which this occurred—where an entire industry got caught up in the "easy money" thinking that characterized

SENTENCING MEMO 7

ROBERT W. GOLDSMITH
*Attorney at law*
705 Second Ave.
Seattle, WA 98104
(206) 623-2800

the real estate bubble.  Ashmore writes that Hiep: "believed what we were told by Chris DiCugno, PC Bank, the Silver State lenders, in fact ALL the other lenders that were offering the people we were referring to them to get loans; that was, that the security was the real estate and that was **all** the lenders cared about. Unfortunately, he bought and sold the lie and it was simply wrong."

### Reflect the Seriousness of the Offense

Any incarceration and removal from work, family, friends and church, is serious.  How much of a removal is necessary to reflect the seriousness of the offense is always a relative measure.  Our proposal involving a mixture of community service hours (positive penal sanctions) to electronic home detention along with some loss of total freedom (30 days) suffices to reflect that seriousness.

### Promote Respect for the Law and Just Punishment.

The public prosecution, humiliation and sanctions, as proposed, all promote respect and are just in that they are "sufficient but not greater than necessary."

### Adequate Deterrence

We believe that others who are tempted to commit fraud will be deterred by the sentence imposed here.

### Protect the Public from further crimes of the Defendant.

Given Hiep's history in this case alone along with his life of consistently moral conduct, this Court need not be concerned with this factor here.

### All of the Needs for the Sentence Set Forth in 18 U.S.C. § 3553(a)(2)(D).

Even if this Court gives Hiep Nguyen more time than we think necessary, none of these issues are relevant here.  Hiep would make the best use of any sentence this Court imposes.

SENTENCING MEMO 8

**Restitution.**

The government memo indicates that $810,500 is the restitution owing; whereas, Probation says $907,000. In addition to this discrepancy, we would request a step by step proof of how these figures were derived. Hence, unless the government can show to our satisfaction, that their numbers make sense, we would request a separate hearing to determine the proper amount of restitution.

### III. CONCLUSION

Based on all the facts and circumstances, and weighing the § 3553(a) factors, a sentence of 30 days along with 6 months of electronic home detention and 200 hours of community service is a fair and "sufficient but not more than necessary" punishment.

Dated: 29 Nov. 2010.                                              Respectfully submitted,

/s/_____
Robert Goldsmith, WSBA # 12265
Attorney for Defendant
Email: bobgoldsmith2@juno.com

CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of Nov., 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent electronically to the Assistant U.S. Attorney, counsel of record for the Government.

DATED this 29th day of Nov., 2010.

_/s/ R. Goldsmith_____

SENTENCING MEMO 9

**ROBERT W. GOLDSMITH**
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-2800

Robert Goldsmith, WSBA # 12265
Email: Bobgoldsmith2@juno.com
Attorney for defendant

SENTENCING MEMO 10

**ROBERT W. GOLDSMITH**
*Attorney at law*
705 Second Ave.
Seattle, WA  98104
(206) 623-2800